IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Larry Roscoe, | ) | C/A No.: 1:17-81-BHH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Nancy A. Berryhill,[1] Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this lawsuit.

I.      Relevant Background

A.      Procedural History

On March 8, 2013, Plaintiff filed an application for DIB in which he alleged his disability began on May 18, 2011. Tr. at 127–33. His application was denied initially and upon reconsideration. Tr. at 78–82 and 87–89. On August 20, 2015, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Ronald Fleming. Tr. at 29–55 (Hr'g Tr.). The ALJ issued an unfavorable decision on September 2, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 10–28. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on January 11, 2017. [ECF No. 1].

B.      Plaintiff's Background and Medical History

1.      Background

Plaintiff was 53 years old at the time of the hearing. Tr. at 34. He completed high school. Tr. at 36. His past relevant work ("PRW") was as a machine fixer and a maintenance mechanic. Tr. at 51. He alleges he has been unable to work since June 29, 2012.[2] Tr. at 33.

---

[2] During the hearing, Plaintiff amended his alleged onset date to June 29, 2012, his fiftieth birthday. Tr. at 33 and 149.

2.     Medical History

Plaintiff has a history of coronary artery disease and underwent cardiac stent placement in 2009. Tr. at 210 and 220.

Plaintiff reported a burning sensation in his lower extremities on June 4, 2010. Tr. at 211. He denied having followed up with neurologist R. Joseph Healy, M.D. ("Dr. Healy"). *Id.* He indicated he was continuing to work for four hours per day, but did not believe he could continue to work with the burning sensation in his feet. *Id.* Travis Novinger, M.D. ("Dr. Novinger"), indicated he believed that Plaintiff would "have difficulty working on 40 hours." *Id.* He further stated "[t]he patient's [considering] disability, however, I have recommended that he see Dr. Healy and get etiology of the peripheral neuropathy first." *Id.*

Plaintiff denied chest pain and exertional dyspnea on October 1, 2010. Tr. at 210. He reported increased neuropathic pain in his lower extremities. *Id.* Dr. Novinger indicated Plaintiff had tried Cymbalta, Lyrica, Neurontin, Elavil, and Hydrocodone and that Hydrocodone seemed to be the only medication that provided some relief. *Id.* Dr. Novinger instructed Plaintiff to continue to take Crestor, Lopressor, and Hydrocodone and to follow up with a neurologist. *Id.* He indicated Plaintiff planned to stop taking Plavix at the end of the year and would remain on aspirin. *Id.*

On March 28, 2011, Plaintiff denied complications and reported he was doing well. Tr. at 209. Dr. Novinger instructed Plaintiff to continue to take Crestor and Hydrocodone, to restart Lopressor, and to follow up in six months. *Id.*

Plaintiff was admitted to Chesterfield General Hospital for pneumonia on September 13, 2011. Tr. at 223. His condition improved with use of ibuprofen and antibiotics and he was released on September 15, 2011. *Id.*

Plaintiff complained of lower extremity pain and discomfort on September 23, 2011. Tr. at 208. He indicated he had been unable to follow up with Dr. Healy because he "owe[d] him so much money." *Id.* Dr. Novinger noted Plaintiff's pneumonia was resolving and observed no abnormalities on physical examination. *Id.* He indicated he would discontinue Crestor temporarily to determine if it was causing myalgia. *Id.*

On October 18, 2011, Plaintiff described numbness and burning that would start at the plantar aspect of his bilateral feet and radiate to his lower back. Tr. at 206. He indicated he was unable to afford to follow up with Dr. Healy. *Id.* He denied having experienced recent chest pain. *Id.* Dr. Novinger restarted Plaintiff on Crestor and indicated he would proceed with a thyroid cascade profile. Tr. at 207. He discontinued Hydrocodone and prescribed Percocet and Elavil. *Id.* He noted that Plaintiff had tried Lyrica and Neurontin in the past without improvement. *Id.*

On December 1, 2011, a computed tomography ("CT") scan of Plaintiff's chest showed marked improvement, but some residual scarring and small nodules in his left lung base and right lower lobe. Tr. at 216.

On March 20, 2012, Plaintiff reported that he was waking with palpitations during the night. Tr. at 205. He denied chest pain, but indicated he felt as if his heart was racing. *Id.* He stated that he was unable to return to his cardiologist for treatment until he

satisfied his account balance. *Id.* Karen Canipe, M.S.N., A.P.R.N. ("Ms. Canipe"), indicated she would refer Plaintiff back to his cardiologist. *Id.*

Plaintiff denied chest pain and shortness of breath and reported that his palpitations had "settled down" on June 20, 2012. Tr. at 204. He reported severe numbness in his hands and lower extremities. *Id.* He indicated he was unable to go back to work because of his neuropathy. *Id.* Dr. Novinger advised Plaintiff to continue to take Hydrocodone for neuropathy and to follow up with Dr. Healy. *Id.* He noted that Plaintiff was "considering disability because he [was] unable to go back to work." *Id.*

Plaintiff reported having no energy and feeling tired and depressed on January 10, 2013. Tr. at 203. He requested that Dr. Novinger prescribe a more affordable statin medication than Crestor. *Id.* Dr. Novinger discontinued Crestor and prescribed Lipitor. *Id.* He advised Plaintiff to follow up with a neurologist and a cardiologist and indicated he would refer him for lab work. *Id.*

Plaintiff followed up with Dr. Healy on March 5, 2013. Tr. at 261. Dr. Healy indicated that Plaintiff had presented to him four years earlier for small fiber neuropathy.[3]

---

[3] According to the United States National Library of Medicine, a service of the National Institutes of Health, small fiber neuropathy is "characterized by severe pain attacks that typically begin in the feet or hands," but can affect other regions as the person ages. Small Fiber Neuropathy, Genetics Home Reference, https://ghr.nlm.nih.gov/condition/small-fiber-neuropathy#resources (published Aug. 29, 2017). "The attacks usually consist of pain described as stabbing or burning, or abnormal skin sensations such as tingling or itchiness" and may be "more severe during times of rest or at night." *Id.* "Individuals with small fiber neuropathy cannot feel pain that is concentrated in a very small area, such as the prick of a pin," but have "an increased sensitivity to pain in general (hyperalgesia) and experience pain from stimulation that typically does not cause pain (hypoesthesia)." *Id.* Some individuals with small fiber neuropathy experience additional symptoms that include urinary or bowel problems, palpitations, dry eyes or

*Id.* He stated that medications had not been particularly beneficial. *Id.* He noted that Plaintiff also had degenerative disc problems with spondylolisthesis in his lumbosacral spine. *Id.* Plaintiff indicated that his pain was interfering with sleep and causing problems in his work as a mechanic. *Id.* He reported that "[e]ven the covers touching his feet cause[d] him to awaken." *Id.* He complained of fatigue, arthralgia, and back pain. *Id.* Plaintiff desired to apply for disability benefits, and Dr. Healy explained to him how to apply and agreed to provide his records. Tr. at 262. He indicated he wanted to further assess Plaintiff's low back problems, neuropathy, and sleep disorder. *Id.* He recommended Plaintiff undergo a nerve biopsy. *Id.*

On March 6, 2013, Plaintiff reported back pain that radiated from his lumbar spine to his upper back. Tr. at 202. He denied chest pain and shortness of breath. *Id.* He complained that Lipitor had increased his back pain. *Id.* Dr. Novinger indicated he would schedule Plaintiff for nerve conduction studies to determine if his neuropathy had worsened. *Id.* He observed Plaintiff to be tender to palpation over his lower lumbar spine and upper back. *Id.* He instructed Plaintiff to continue to take Skelaxin and Hydrocodone for back pain and to follow up with Dr. Healy for neuropathy. *Id.* He indicated he would discontinue Lipitor for a month and would restart Plaintiff on another statin if his back pain improved. *Id.*

---

mouth, abnormal sweating, and orthostasis. *Id.* A court may take judicial notice of factual information located in postings on government websites. *See Phillips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) ("court may take judicial notice of matters of public record").

On March 25, 2013, electrodiagnostic studies showed early bilateral carpal tunnel syndrome. Tr. at 288–89. The following day, magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine revealed early degenerative changes at L4-5 and L5-S1; central posterior bulging at L4-5 and L5-S1; patent neuroforamen; and possible very mild spondylolisthesis of L5 on S1. Tr. at 283.

Plaintiff presented to the emergency room at Chesterfield General Hospital on April 5, 2013. Tr. at 220. He claimed he was out of Hydrocodone and was experiencing severe pain in his legs as a result of peripheral neuropathy. *Id.* The attending physician prescribed 12 Hydrocodone-Acetaminophen 650/10 mg tablets and instructed Plaintiff to follow up with Dr. Novinger. Tr. at 221.

Plaintiff followed up with Dr. Healy on April 15, 2013. Tr. at 259. He reported burning in his lower extremities and pain in his back that were exacerbated by activity. *Id.* Dr. Healy noted that straight leg raising and bent leg pull produced low back pain. *Id.* He stated there was "some very mild shading in the primary modality testing typically in the lower extremities and very mild bilateral early carpal tunnel syndrome." *Id.* He diagnosed degenerative arthritis of the lumbar spine, idiopathic neuropathy, and sleep disturbances. *Id.* He indicated Plaintiff had no evidence of radiculopathy and that the best course of action would be to control his neuropathic pain. Tr. at 260. He indicated Plaintiff had elected to proceed with an epidural steroid injection ("ESI") in his lower back. *Id.*

State agency medical consultant Mary Lang, M.D. ("Dr. Lang"), reviewed the evidence and completed a physical residual functional capacity ("RFC") assessment on

May 22, 2013. Tr. at 60–62. She indicated Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; frequently push and pull; frequently kneel, crouch, crawl, and climb ramps and stairs; never climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to extreme cold, vibration, fumes, odors, dust, gases, poor ventilation, and hazards. *Id.* A second state agency medical consultant Ellen Humphries, M.D. ("Dr. Humphries"), assessed the same restrictions on June 27, 2013. Tr. at 71–74.

On August 8, 2013, Plaintiff reported increased lower back pain since undergoing the ESI. Tr. at 271. Dr. Novinger observed Plaintiff to be tender to palpation over his lower lumbar spine. *Id.* He noted that Plaintiff had been having such severe pain that he had been unable to work. *Id.*

On October 23, 2013, Dr. Novinger indicated Plaintiff was not taking a statin medication because he had been unable to tolerate Crestor and Lipitor. Tr. at 269. Plaintiff complained of significant burning and discomfort in his feet and pain in his lower back that radiated down his right leg. *Id.* He indicated he had been waking during the night with pain and burning in his legs. *Id.* Dr. Novinger prescribed Pravastatin and increased Plaintiff's prescription to 120 tablets of Hydrocodone-Acetaminophen 10/325 mg. Tr. at 270.

On November 11, 2013, Plaintiff complained of pain that was worse in his right leg than his left. Tr. at 268. He indicated that an ESI had provided no relief. *Id.* He requested a prescription for Flexeril to relax his muscles during the night. *Id.* He

indicated that he had not done well with Percocet. *Id.* Dr. Novinger prescribed Flexeril 10 mg and instructed Plaintiff to continue taking Pravastatin 20 mg daily and Hydrocodone-Acetaminophen 10-325 mg four times a day. *Id.*

Plaintiff reported severe peripheral neuropathy on February 7, 2014, but indicated that Hydrocodone-Acetaminophen provided some relief. Tr. at 267. He was tolerating Pravastatin well and denied myalgia and arthralgia. *Id.* He indicated Flexeril had not improved his sleep. *Id.* Dr. Novinger discontinued Flexeril and prescribed Ambien. *Id.*

Dr. Novinger completed a medical source statement on April 30, 2014. Tr. at 274. He indicated Plaintiff could work for four hours per day. *Id.* He stated Plaintiff could stand for 15 minutes at a time and for 60 minutes during an eight-hour workday. *Id.* He indicated Plaintiff could sit for 30 minutes at a time and for 60 minutes during an eight-hour workday. *Id.* He stated Plaintiff could occasionally lift 20 pounds, but was unable to engage in frequent lifting. *Id.* He indicated Plaintiff could occasionally bend, stoop, and operate a motor vehicle. *Id.* He specified that Plaintiff could never balance or work around dangerous equipment. *Id.* He indicated Plaintiff could constantly engage in gross and fine manipulation with his bilateral hands, raise his bilateral arms over shoulder level, and tolerate heat, cold, dust, smoke, fumes, and noise. *Id.* He stated Plaintiff would not be required to elevate his legs during an eight-hour workday. *Id.* He assessed Plaintiff's pain as "severe." *Id.* He indicated Plaintiff had peripheral neuropathy of unknown etiology and coronary artery disease. *Id.*

Plaintiff presented to Palmetto Orthopedics on January 29, 2015. Tr. at 275. He reported that he had sustained a recent fall down 12 stairs and had injured his right

shoulder and elbow and left hip. *Id.* F. H. Qureshi, M.D. ("Dr. Qureshi"), observed

Plaintiff to have moderate tenderness to palpation over the anterior and superior aspect of

his right shoulder. *Id.* He indicated Plaintiff had unremarkable range of motion ("ROM")

of his right elbow, wrist, and hand and no neurological deficit. *Id.* However, he noted that

ROM was painful and limited. *Id.* Plaintiff reported mild discomfort on palpation over

the posterior aspect of the iliac crest and had a resolving hematoma. *Id.* X-rays were

normal. *Id.* Dr. Qureshi instructed Plaintiff to keep his right arm in the sling for two

additional weeks and to follow up in three weeks. *Id.*

      C.     The Administrative Proceedings

          1.     The Administrative Hearing

              a.     Plaintiff's Testimony

At the hearing on August 20, 2015, Plaintiff testified that he experienced daily

lower back pain. Tr. at 39. He stated he had neuropathy in his feet. *Id.* He described an

initial burning feeling as if he were walking on hot coals. Tr. at 47. He indicated the

feeling became duller as it radiated up his legs and then became severe again once it

reached his back. *Id.*

Plaintiff reported that he had stopped using splints for carpal tunnel syndrome

because they were not very helpful. Tr. at 40. He endorsed occasional chest pain that

would subside after 10 to 15 minutes and indicated he occasionally took Nitroglycerin.

Tr. at 41. He denied having recently visited a cardiologist and indicated he was unable to

afford the cost for a consultation. Tr. at 42.

Plaintiff testified that he took four Hydrocodone pills per day for pain. Tr. at 40. He stated they made him feel "[a] little dizzy-like" and "sort of drunk", but provided "a little bit of relief." Tr. at 49–50. He indicated medications specifically for neuropathy had provided no relief. Tr. at 40–41. He stated he would sometimes take a "real hot, hot bath" for 10 to 15 minutes to temporarily ease his pain. Tr. at 48. He indicated his wife would sometimes rub his feet and back to reduce his pain for a short period. *Id.* He stated he would use a heating pad two or three times per week. Tr. at 49.

Plaintiff indicated he had difficulty sleeping. Tr. at 42. He reported that he had stopped using Ambien because he did not like its side effects. *Id.* He indicated he typically used Tylenol PM to get two to three hours of good sleep at a time. Tr. at 42–43. He estimated that he could sit for 30 minutes, stand for 10 minutes, and walk for 15 minutes at a time. Tr. at 43. He stated he was unable to lift his 18-month-old grandchild for "any period of time." *Id.* He estimated he could lift and carry five to 10 pounds on a continuous basis. *Id.* He indicated he could bend, kneel, and squat, but denied being able to crawl. Tr. at 44.

Plaintiff testified that he typically drove once or twice a week. Tr. at 36. He indicated he was able to engage in self-care activities, but required breaks between showering, shaving, and brushing his teeth. Tr. at 44. He denied doing yard work and most household chores, but indicated he helped his wife with the laundry. Tr. at 45–46. He stated he would "get out every now and then," but testified that he did not engage in activities outside his home nearly as often as he had in the past. Tr. at 46. He indicated he

spent most of his time lying down and watching television. *Id.* He stated he was no longer able to go fishing or to maintain his vegetable garden. Tr. at 49.

b.     Vocational Expert Testimony

Vocational Expert ("VE") Mark Leaptrot reviewed the record and testified at the hearing. Tr. at 50. The VE categorized Plaintiff's PRW as a machine fixer, *Dictionary of Occupational Titles* ("*DOT*") number 689.260-010, as medium with a specific vocational preparation ("SVP") of six and a maintenance mechanic, *DOT* number 638.281-014, as heavy with an SVP of seven. Tr. at 51. However, the VE indicated Plaintiff performed the jobs at the light exertional level. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work with frequent climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; frequent balancing; occasional stooping; and no kneeling, crouching, or crawling. *Id.* He indicated the individual should avoid concentrated exposure to extreme cold, vibration, fumes, odors, dust, gases, poor ventilation, dangerous machinery, and heights and could frequently push and pull. *Id.* The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW because it required exposure to dangerous machinery. *Id.* The ALJ asked whether there were any other jobs that the hypothetical person could perform. Tr. at 52. The VE identified light jobs with an SVP of two as an information clerk, *DOT* number 237.367-018, with at least 24,000 positions in the national economy; an office helper, *DOT* number 239.567-010, with at least 44,000 positions in the national economy; and a routing clerk, *DOT* number 222.687-022, with 41,000 positions in the national economy. Tr. at 52.

For a second hypothetical question, the ALJ described an individual of Plaintiff's vocational profile who could perform sedentary work with frequent climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; frequent balancing; occasional stooping; and no kneeling, crouching, or crawling. *Id.* He indicated the person must avoid concentrated exposure to extreme cold, vibration, fumes, odors, dust, gases, poor ventilation, machinery, and heights; would be limited to frequent pushing and pulling; and would be off task for 20 percent of the workday. *Id.* The ALJ asked if there would be any work that the hypothetical individual could perform. *Id.* The VE indicated that an individual who was off task for 20 percent of the workday would not be able to meet minimum requirements for attention and concentration. Tr. at 52–53.

Plaintiff's attorney asked the VE to review a medical opinion statement from Dr. Novinger. Tr. at 53. He asked the VE if an individual with the limitations Dr. Novinger indicated would be able to perform unskilled work at the light exertional level. *Id.* The VE indicated the individual would be unable to complete an eight-hour workday at any exertional level. *Id.*

Plaintiff's attorney asked the VE to consider an individual who would have to walk for five to 10 minutes after having sat for 30 minutes. Tr. at 54. The VE stated the individual would require breaks in excess of the number allowed by employers. *Id.*

2.    The ALJ's Findings

In his decision dated September 2, 2015, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2. The claimant has not engaged in substantial gainful activity since June 29, 2012, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.917 *et seq.*).

3. The claimant has the following severe impairments: lumbar spine degenerative disc disease, peripheral neuropathy, and coronary artery disease with stenting (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b); that is further limited to: frequent climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; frequent balancing; occasional stooping; no kneeling, crouching, or crawling; avoid concentrated exposure to extreme cold, vibration, fumes, odors, dust, gases, poor ventilation, dangerous machinery and heights; and frequent pushing and pulling.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 29, 1962, and was 50 years old, which is defined as an individual closely approaching advanced age, on the amended alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See 20 SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 29, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 15–24.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)      the ALJ gave reduced weight to Plaintiff's allegations based on his failure to obtain additional medical treatment without addressing his reasons for not getting more treatment; and

2)      the Appeals Council failed to weigh new and material evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.      Analysis

1.      Additional Treatment

Plaintiff argues the ALJ erred in discounting his allegations based on his failure to obtain additional treatment. [ECF No. 11 at 15]. He maintains that the ALJ gave less weight to his subjective statements because he obtained no medical treatment between February 2014 and January 2015, but did not consider that he was unable to afford treatment. *Id.* at 16. He contends that the objective findings in the record were limited because he was unable to afford to see medical specialists. [ECF No. 13 at 2].

The Commissioner argues that substantial evidence sustains the ALJ's conclusion that the evidence does not support the intensity, persistence, and limiting nature of the symptoms Plaintiff alleged. [ECF No. 12 at 11]. She contends that the clinical picture showed limited objective findings and that Plaintiff's physicians consistently described him as being in no apparent distress and having no mobility limitations. *Id.* at 11–12. She

maintains that the ALJ considered that Plaintiff's overall treatment had been routine and conservative and that he had only sought emergency treatment on one occasion and had not required hospitalization. *Id.* at 12. She concedes that the ALJ noted a gap in Plaintiff's treatment of nearly a year without having obtained an explanation from Plaintiff as to the reason for the gap, but she argues the ALJ did not solely base his credibility assessment on Plaintiff's lack of treatment during this period. *Id.*

Pursuant to SSR 96-7p, after finding that a claimant has a medically-determinable impairment that could reasonably be expected to produce his alleged symptoms, an ALJ should evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the restrictions they impose on his ability to do basic work activities. If the objective medical evidence does not substantiate the claimant's statements about the intensity, persistence, or limiting effects of his symptoms, the ALJ is required to consider the credibility of the statements in light of the entire case record. SSR 96-7p. The ALJ must consider "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* In addition to the objective medical evidence, the ALJ should consider the claimant's ADLs; the location, duration, frequency, and intensity of his pain or other symptoms; factors that precipitate and aggravate his symptoms; the type, dosage, effectiveness, and side effects of his medications; treatment, other than medication, he receives or has received; any measures other than treatment and medications he uses or has used to

relieve his pain or other symptoms; and any other relevant factors concerning his limitations and restrictions. *Id.*

"In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements." *Id.* However, "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information that may explain infrequent or irregular medical visits or failure to seek medical treatment." *Id.*; *see also* 20 C.F.R. § 404.1530. Fourth Circuit precedent directs that ALJs may not deny benefits to claimants who lack the financial resources to obtain treatment. *See Lovejoy v. Heckler,* 790 F.2d 1114, 1117 (4th Cir.1986) (holding that the ALJ erred in determining that the plaintiff's impairment was not severe based on her failure to seek treatment where the record reflected that she could not afford treatment); *Gordon v. Schweiker,* 725 F.2d 231, 237 (4th Cir.1984) ("it flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him"). When a claimant alleges an inability to afford treatment and an ALJ considers the failure to obtain treatment as a factor that lessens the claimant's credibility, the ALJ must make specific findings regarding the claimant's ability to afford treatment. *See Dozier v. Colvin*, C/A No. 1:14-29-DCN, 2015 WL 4726949, at *4 (D.S.C. Aug. 10, 2015) (remanding the case

because the ALJ did not include specific factual findings regarding the resources available to the plaintiff and whether "her failure to seek additional medical treatment was based upon her alleged inability to pay"); *Buckley v. Commissioner of Social Sec. Admin.*, C/A No. 1:14-124-TLW, 2015 WL 3536622, at *21 (D.S.C. Jun. 4, 2015) (finding the ALJ adequately considered the claimant's allegation that she lacked the financial resources to obtain treatment as part of the credibility determination where the ALJ cited specific evidence in the record that contradicted the claimant's allegation).

The ALJ found that Plaintiff's medically-determinable impairments could reasonably be expected to cause his alleged symptoms, but that his allegations concerning his impairments, symptoms, and ability to work were not substantiated by the record as a whole and were not fully credible. Tr. at 21. He stated it was "particularly noteworthy that although the claimant alleges disability in part due to debilitating musculoskeletal and peripheral neuropathy pain, he is consistently described in treating physicians' notes throughout the record, which covers an expanse of several years, as not appearing in any apparent distress and with no mobility limitations." Tr. at 16. He indicated "the clinical picture reflected in the treatment record shows limited objective findings to support the degree of continuing limitations asserted by the claimant" and noted that "claimant's treatment ha[d] been routine, conservative, and typically limited to medications." *Id.* The ALJ explained that the record did not support Plaintiff's allegation that he spent the majority of the day lying on the couch because he had not reported this level of impairment to his medical providers and his providers had failed to record findings consistent with the level of restriction alleged, such as muscle atrophy or poor muscle

tone. Tr. at 22. He stated Plaintiff demonstrated no evidence of significant discomfort and had no difficulty participating in the hearing. *Id.*

The ALJ noted "[t]he record shows that the claimant has not had any treatment for any of his conditions from approximately February 2014, until nearly a year later in January 2015. This failure to pursue treatment does not support the claimant's allegations of disabling symptoms." Tr. at 19.

The record shows that Plaintiff faced significant financial hardship and struggled to afford medical treatment. On September 23, 2011 and October 18, 2011, Plaintiff reported he was unable to follow up with Dr. Healy because he "owe[d] him so much money." Tr. at 206 and 208. On March 20, 2012, Plaintiff stated he was unable to return to his cardiologist for treatment until he satisfied his account balance. Tr. at 205. On January 10, 2013, Plaintiff requested that Dr. Novinger prescribe a more affordable statin medication than Crestor. Tr. at 203. A letter from Plaintiff's wife dated February 25, 2015, indicates that her family had lost health insurance coverage when she was terminated from her job on February 1, 2015. Tr. at 280. During the hearing, Plaintiff testified that he had been unable to afford the upfront payment that was required for him to follow up with his cardiologist. Tr. at 42. In addition, Plaintiff had requested that his hearing be expedited because his mortgage company had initiated foreclosure proceedings on his primary residence. *See* Tr. at 121–23.

Because Plaintiff presented significant evidence to suggest he was unable to afford additional medical treatment, the ALJ erred in considering his failure to obtain treatment between February 2014 and January 2015 as a factor that reduced the credibility of his

allegations without also considering his reasons for not obtaining additional treatment. Plaintiff's inability to afford additional treatment is also pertinent to the ALJ's reliance on limited objective findings to support his conclusion that Plaintiff's allegations were not entirely credible. The record suggests that Plaintiff declined to pursue some objective testing because he could not afford it. *See* Tr. at 206 (noting that Plaintiff had not obtained blood work for a potential thyroid problem because he lost the lab slip and could not afford to go back to the doctor). In addition, Plaintiff failed to follow up with Dr. Healy for recommended nerve biopsy. *See* Tr. at 262.

The Commissioner appears to concede that the ALJ erred in citing Plaintiff's lack of medical treatment without also considering his reasons for failing to obtain additional treatment, but argues this error is inconsequential because the ALJ relied on other substantial evidence. [ECF No. 12 at 13]. Although the Fourth Circuit was not presented with this specific argument in *Lovejoy*, it appeared to anticipate and reject it. It noted the following:

> We recognize that the Secretary did not deny benefits on the basis of noncompliance with prescribed treatment; however, it is as erroneous to consider the claimant's failure to seek treatment as a factor in the determination that her impairment is not severe as it would be to reach the ultimate conclusion that the claimant is not disabled because she failed to follow prescribed treatment when that failure is justified by lack of funds.

*Lovejoy*, 790 F.2d at 1117, citing *Preston v. Heckler*, 769 F.2d 988 (4th Cir. 1985). This court has considered the Commissioner's argument in other cases, but has generally concluded that the ALJ's failure to consider the plaintiff's reasons for not obtaining additional treatment infected the entire credibility assessment. *See Thomas v. Colvin*, No.

6:15-3251-MBS-KFM, 2016 WL 5109199, at *10 (D.S.C. Aug. 24, 2016) (rejecting the Commissioner's argument that the ALJ did not base her decision predominantly on the plaintiff's failure to obtain psychiatric treatment because "nowhere in the decision does the ALJ state her primary reason for the RFC finding"); *Sox v. Astrue*, No. 6:09-1609-KFM, 2010 WL 2746718, at *13 (D.S.C. July 2, 2010) (noting that "the ALJ's discussion of plaintiff's 'erratic course of treatment' is located in the midst of his analysis of the plaintiff's credibility" and directing that, on remand, the ALJ should not draw any negative inferences about the plaintiff's symptoms and their functional effects from her irregular medical visits without first considering her explanation and the evidence that supports it).

Similarly, in the instant case, it is impossible for the court to determine to what extent the ALJ relied on Plaintiff's failure to obtain additional medical testing and to regularly follow up with his medical providers in assessing the credibility of his subjective complaints. Therefore, the undersigned recommends the court find the ALJ erred in considering Plaintiff's failure to obtain medical treatment in assessing his credibility without having also considered whether the gap in treatment resulted from his financial hardship.

2.      New Evidence

Plaintiff submitted new evidence to the Appeals Council in the form of a one-page questionnaire completed by Dr. Healy on September 27, 2016. *See* Tr. at 290. Dr. Healy responded "[n]o" to a question as to whether Plaintiff should engage in more than sedentary work. *Id.* He indicated the diagnosis that supported the restriction was "small

24

fiber neuropathy." *Id.* He stated the basis for his opinion regarding the level of severity was "clinical evaluation and judgment." *Id.* He noted the records available to him suggested Plaintiff had been impaired as described for a period of four years. *Id.*

Plaintiff argues the Appeals Council erred in failing to remand the case because the new evidence might have reasonably affected the ALJ's decision. [ECF No. 11 at 17–18]. He maintains that Dr. Healy's opinion that he could not engage in more than sedentary work was material because the ALJ noted in his decision that Dr. Healy had not opined that he was disabled. *Id.* at 18.

The Commissioner argues that Dr. Healy's opinion was not supported by the record. [ECF No. 12 at 14]. She maintains "there were no findings that Plaintiff had reduced strength, gait disturbances, or any neurological deficits that would significantly limit his ability to lift, carry, and walk, let alone restrict him to the minimal exertional requirements of sedentary work." *Id.* She contends the ALJ relied on the state agency physicians' assessments in determining Plaintiff's RFC. *Id.* at 15. She claims Dr. Healy's records were not consistent with a restriction to sedentary work. *Id.* at 16.

A claimant may submit additional evidence that was not before the ALJ at the time of the hearing, along with a request for review of the ALJ's decision. *Meyer v. Astrue,* 662 F.3d 700, 705 (4th Cir. 2011), citing 20 C.F.R. § 404.967. However, the evidence must be both "new" and "material" and the Appeals Council may only consider the additional evidence "where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b) (effective February 9,

1987 to January 16, 2017).[6] If new and material evidence is offered and it pertains to the period on or before the date of the ALJ's hearing decision, the Appeals Council should evaluate it as part of the entire record. *Id.* After reviewing the new and material evidence and all other evidence of record, the Appeals Council will either issue its own decision or remand the claim to the ALJ if it concludes that the ALJ's "action, findings, or conclusion" was "contrary to the weight of the evidence." *Meyer*, 662 F.3d at 705, citing 20 C.F.R. § 404.970(b). However, if after considering all the evidence, the Appeals Council decides that the ALJ's actions, findings, and conclusions were supported by the weight of the evidence, the Appeals Council will deny review and is not obligated to explain its rationale. *Id.* at 705–06.

"In reviewing the Appeals Council's evaluation of new and material evidence, the touchstone of the Fourth Circuit's analysis has been whether the record, combined with the new evidence, 'provides an adequate explanation of [the Commissioner's] decision.'" *Turner v. Colvin*, No. 0:14-228-DCN, 2015 WL 751522, at *5 (D.S.C. Feb. 23, 2015), citing *Meyer*, 662 F.3d at 707 (quoting *DeLoatche v. Heckler*, 715 F.3d 148, 150 (4th Cir. 1983)). After reviewing new evidence submitted to the Appeals Council, the court should affirm the ALJ's decision to deny benefits where "substantial evidence support[ed] the ALJ's findings." *Id.*, citing *Smith v. Chater*, 99 F.3d 635, 638–39 (4th Cir. 1996).

---

[6] A change to 20 C.F.R. § 404.970(b) effective January 17, 2017, requires that claimants show good cause for failing to submit the evidence earlier and specifies reasons that support a finding of good cause. However, because the Appeals Council reviewed this case prior to January 17, 2017, the prior version of 20 C.F.R. § 404.970(b) applies, and Plaintiff was not required to show good cause for failing to submit the evidence to the ALJ.

However, if a review of the record as a whole shows the new evidence supported Plaintiff's claim and was not refuted by other evidence of record, the court should reverse the ALJ's decision and find it to be unsupported by substantial evidence. *Id.*, citing *Wilkins v. Secretary, Department of Health and Human Services*, 953 F.3d 93, 96 (4th Cir. 1991). If the addition of the new evidence to the record does not allow the court to determine whether substantial evidence supported the ALJ's denial of benefits, the court should remand the case for further fact finding. *Id.*

The Appeals Council considered Dr. Healy's opinion (Tr. at 4), but found that it did "not provide a basis for changing" the ALJ's decision. Tr. at 2.

Pertinent to Plaintiff's argument, the ALJ wrote the following:

> At the office visit in March 2013, the claimant indicated that he want[ed] to apply for disability. Dr. Healy indicated that he explained to the claimant how to do this. However, the undersigned has noted that Dr. Healy did not indicate that the claimant was disabled. He only provided information to the claimant on how to apply for disability and that he would provide his records.

Tr. at 19.

In *Meyer*, 662 F.3d at 707, the court found that the Appeals Council erred in failing to remand the case to the ALJ for consideration of the plaintiff's treating physician's opinion. The court noted that "[t]he ALJ emphasized that the record before it lacked 'restrictions placed on the claimant by a treating physician,' suggesting that this evidentiary gap played a role in its decision." *Meyer*, 662 F.3d at 707.

Similar to the ALJ in *Meyer*, the ALJ in the instant case noted in his decision that Dr. Healy, Plaintiff's treating neurologist, had not indicated Plaintiff was disabled (Tr. at

19), and Plaintiff submitted to the Appeals Council a statement from Dr. Healy that suggested he was disabled.[7] In *Meyer*, 622 F.3d at 707, the court conceded that the ALJ had not relied solely on the absence of the treating physician's opinion to support his decision and had cited other evidence that conflicted with the new evidence, but found that remand was appropriate because "no fact finder ha[d] made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record." The same reasoning applies in the instant case. Although the Commissioner argues Dr. Healy's opinion was not supported by the evidence as a whole, the undersigned notes it was consistent with Plaintiff's use of four Hydrocodone-Acetaminophen 10/350 mg tablets per day for pain (Tr. at 260) and his numerous complaints to his physicians of lower extremity pain (Tr. at 204, 208, 210, 220, 258, 261, 268, and 269). It was also generally consistent with Dr. Novinger's opinion. *See* Tr. at 264. Therefore, the undersigned recommends the court find the Appeals Council erred in failing to remand the case to the ALJ for further consideration based on the Fourth Circuit's holding in *Meyer* and in light of the ALJ's suggestion that Dr. Healy's failure to indicate Plaintiff was disabled influenced his decision.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is

---

[7] The ALJ did not use the word "disabled" in his opinion, but his indication that Plaintiff could perform no more than sedentary work was consistent with a finding of disability under Medical-Vocational Rule 201.14 because of his age, education, and PRW.

supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

August 31, 2017                                  Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).